# Supreme Court of Florida

_____

No. SC18-67
_____

**CITIZENS FOR STRONG SCHOOLS, INC., et al.,**
Petitioners,

vs.

**FLORIDA STATE BOARD OF EDUCATION, et al.,**
Respondents.

January 4, 2019

PER CURIAM.

This case involves a nearly ten-year attempt by Petitioners to have the State

of Florida's K-12 public education system declared unconstitutional due to the

State's alleged failure to comply with article IX, section 1(a) of the Florida

Constitution, which provides in relevant part as follows:

> (a) The education of children is a fundamental value of the
> people of the State of Florida. It is, therefore, a paramount duty of the
> state to make adequate provision for the education of all children
> residing within its borders. Adequate provision shall be made by law
> for a uniform, efficient, safe, secure, and high quality system of free
> public schools that allows students to obtain a high quality education
> . . . .

Art. IX, § 1(a), Fla. Const. Specifically, Petitioners seek a declaration that the State is breaching its "paramount duty to make adequate provision for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education." And Petitioners request the courts to order the State "to establish a remedial plan that . . . includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."

The language in article IX, section 1(a) regarding "fundamental value," "paramount duty of the state," and "efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education" was added in 1998, after the changes were proposed by the Constitution Revision Commission (CRC) and approved by the voters. Prior to 1998, article IX, section 1 provided in relevant part as follows:

> Adequate provision shall be made by law for a uniform system of free public schools . . . .

The 1998 amendments were in part in response to *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles* (*Coalition*), 680 So. 2d 400 (Fla. 1996), in which this Court upheld the trial court's dismissal with prejudice of a complaint that "asked the trial court to declare that an adequate education is a fundamental right . . . and that the State has failed to provide its students that fundamental right by failing to allocate adequate resources for a uniform system of free public

schools." *Id.* at 402. The allegations in *Coalition*—made in the context of "a blanket assertion that the entire system is constitutionally inadequate," *id.* at 406—focused on purported inadequacies in funding and disparities relating to certain subgroups of students, including "[e]conomically deprived students," disabled students, and "[s]tudents in property-poor counties." *Id.* at 402. This Court upheld the dismissal with prejudice because the appellants made "an insufficient showing" "to justify" "judicial intrusion" into the Legislature's powers and responsibilities. *Id.* at 407; *see id.* at 408 (Overton, J., concurring).

Here, Petitioners' blanket challenge bears a striking resemblance to that in *Coalition*, namely in its focus on purportedly inadequate funding and on disparities relating to certain subgroups of students. The trial court, relying on *Coalition* and dismissing the relevance of the 1998 amendments, rejected Petitioners' challenge. The First District Court of Appeal affirmed.

We have for review *Citizens for Strong Schools, Inc. v. Florida State Board of Education* (*Citizens*), 232 So. 3d 1163 (Fla. 1st DCA 2017), in which the First District concluded that the 1998 amendments—namely, the words "efficient" and "high quality"—do not provide sufficiently manageable standards to overcome the political question and separation of powers concerns that were determinative in *Coalition*. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

- 3 -

We conclude that *Coalition* defeats Petitioners' claim because Petitioners—like the appellants in *Coalition*—fail to present any manageable standard by which to avoid judicial intrusion into the powers of the other branches of government. Accordingly, we approve the result reached by the First District. Before explaining our decision, we review the lengthy procedural history of this case.

## I. BACKGROUND

This case began in November 2009—in the wake of the Great Recession—when certain public school students, parents, and citizen organizations (collectively, Petitioners) filed suit against the State Board of Education, the President of the Florida Senate, the Speaker of the Florida House of Representatives, and the Florida Commissioner of Education (collectively, Respondents) seeking a declaration that the State is breaching its paramount duty under article IX, section 1(a). Or as the First District later described it, Petitioners' claim is "that the State's entire K-12 public education system—which includes 67 school districts, approximately 2.7 million students, 170,000 teachers, 150,000 staff members, and 4,000 schools—is in violation of the Florida Constitution." *Citizens*, 232 So. 3d at 1165.

In their complaint, Petitioners cited the 1998 amendments to article IX, section 1 and asserted that "adequate provision" and "high quality" are to be "measured by both the enumerated characteristics of and inputs into the system

- 4 -

itself as well as the outcome results of that system." Petitioners largely focused on purported inadequacies in funding and alleged that the "2009 Appropriations Act for K-12 education violates the Education Clause of the Florida Constitution." Petitioners also criticized, among other things, the State's "current accountability policy," "misus[e]" of standardized test results, inadequate graduation rates, and achievement test results. Petitioners further alleged that the State's alleged "failure to provide a high quality education disproportionately impacts minority, low income and students with disabilities." In the end, Petitioners requested that the trial court order Respondents "to establish a remedial plan that conforms with the Florida Constitution." Petitioners later amended their complaint to request that the remedial plan "include[] necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."

## Respondents' Motion to Dismiss

Respondents moved to dismiss Petitioners' complaint, principally on the basis that Petitioners' claim "alleges a non-justiciable political question" and was similar to the blanket challenge rejected in *Coalition*. The trial court denied Respondents' motion, distinguishing *Coalition* as "no longer binding authority" because the allegations there were less comprehensive and were "based on a prior and weaker version of the current Article IX, Section 1." The trial court instead relied on this Court's 2006 decision in *Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006),

- 5 -

which interpreted the post-1998 article IX, section 1 in the context of a challenge to a voucher program. The trial court pointed to language in *Holmes* that noted that the 1998 amendments had been drafted "to provide *standards* by which to measure the adequacy of the public school education provided by the state." (Quoting *Holmes*, 919 So. 2d at 403.) The trial court thus permitted Petitioners' claim "seek[ing] system-wide declaratory and supplemental relief" to proceed.

**Respondents' Petition for a Writ of Prohibition**

Respondents—continuing to rely on *Coalition*—next petitioned the First District for a writ of prohibition, asserting that the trial court lacked jurisdiction to adjudicate the political questions presented by the case. *Haridopolos v. Citizens for Strong Sch., Inc.*, 81 So. 3d 465, 470 (Fla. 1st DCA 2011). The First District sitting en banc denied the petition but noted that Respondents' arguments regarding the political question doctrine would remain available on appeal. *Id.* at 471. The First District also certified the following as a question of great public importance:

> DOES ARTICLE IX, SECTION 1(A), FLORIDA CONSTITUTION, SET FORTH JUDICIALLY ASCERTAINABLE STANDARDS THAT CAN BE USED TO DETERMINE THE ADEQUACY, EFFICIENCY, SAFETY, SECURITY, AND HIGH QUALITY OF PUBLIC EDUCATION ON A STATEWIDE BASIS, SO AS TO PERMIT A COURT TO DECIDE CLAIMS FOR DECLARATORY JUDGMENT (AND SUPPLEMENTAL RELIEF) ALLEGING NONCOMPLIANCE WITH ARTICLE IX, SECTION 1(A) OF THE FLORIDA CONSTITUTION?

*Id.* at 473. Judge Roberts and six other judges dissented, arguing that the petition should be granted. *Id.* at 481 (Roberts, J., dissenting). Judge Roberts examined *Coalition* and concluded that the 1998 amendments were "ultimately irrelevant":

> Whether the [Constitution Revision] Commission intended to create a justiciable standard is ultimately irrelevant. The test is whether an enforceable standard was actually created by the text of the amendment itself. Because the terms "efficient . . . and high quality" are no more susceptible to judicial enforcement than the term "adequate," this claim cannot be enforced by the courts.

*Id.* at 478 (Roberts, J., dissenting).

This Court declined to exercise jurisdiction. *Haridopolos v. Citizens for Strong Sch., Inc.*, 103 So. 3d 140 (Fla. 2012) (table).

### Petitioners' Second Amended Complaint

In May 2014—nearly 4.5 years after their original complaint challenging the "2009 Appropriations Act"—Petitioners filed a Second Amended Complaint.[1] Petitioners again focused on funding, including alleged failures of the State both to provide an adequate "overall level of funding" and to "conduct[] a cost analysis in order to determine the amount of funding required to institute a high quality education system." Petitioners also alleged that the State had failed to provide "a 'uniform' system of free public schools," was instead "systematically diverting

---

[1]. Among other things, the Second Amended Complaint included a new Count challenging the State's voluntary, pre-kindergarten program. That Count was severed and is not before this Court.

public funds to private schools," and had "created a parallel system of schools." To support their uniformity argument, Petitioners described two choice programs—the Florida Tax Credit Scholarship Program (FTC) and the McKay Scholarship for Students with Disabilities Program (McKay). Petitioners also alleged for the first time that the State had failed to provide an "efficient system of free public schools," claiming that the State's various reforms and programs had "wasted millions of dollars without producing the desired effect of a high quality public school system." Petitioners reiterated their allegation that the State had failed to produce a "high quality" system, and they again requested an order directing Respondents "to establish a remedial plan that . . . includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students."

## FTC/McKay Intervenors

In the wake of Petitioners' factual allegations regarding the FTC and McKay programs, the trial court permitted certain parents whose children were beneficiaries of those programs to intervene (Intervenors). Petitioners later filed a Motion for Partial Summary Judgment seeking a declaratory judgment that the FTC and McKay programs violate the uniformity requirement of article IX, section 1(a). The Intervenors opposed and submitted their own Motion for Partial Judgment on the Pleadings.

The trial court eventually ruled that the Second Amended Complaint did not contain any "claim that either program violates the Florida Constitution" and did not include any request for declaratory relief with respect to either program. The trial court also ruled that Petitioners lacked standing to challenge the FTC program. The trial court nevertheless permitted Petitioners—consistent with the pleadings— to present evidence "regarding the impact of each program on the uniformity and funding of the overall public education system."

**The Trial Court's Final Judgment**

After years of substantial discovery, the case proceeded to trial in 2016. After a nearly four-week bench trial involving dozens of witnesses and more than 5,000 exhibits, the trial court—a different trial judge than the one who originally denied Respondents' motion to dismiss—entered Final Judgment against Petitioners "on all claims." The trial court did so after making extensive and detailed findings. Indeed, the Final Judgment includes a 175-page appendix of findings of fact.

The trial court early on noted that "Florida's system of education is structurally complicated," in part because each county has its own school board with constitutional duties and authority. The trial court thus explained that variability necessarily exists between school districts, even among those with equivalent funding, given "variations in how the local districts allocate their

- 9 -

resources." And the trial court concluded that the school districts, who were not parties to the suit, were "indispensable parties" to the extent Petitioners "seek relief for decisions that Florida law entrusts to local school districts—including decisions on hiring, staffing, and the allocation of resources among schools within a particular district."

The trial court went on to address the issue of justiciability anew, concluding that Petitioners presented a nonjusticiable "blanket" challenge to the adequacy of the entire education system and that, despite the 1998 amendments, the "new adjectives . . . —'efficient and high quality'—do not give judicially manageable content to the adequacy standard that was held non-justiciable in the *Coalition* case." In other words, the issues remained "political questions best resolved in the political arena." The trial court noted for example that "many of Florida's education policies and programs are subject to ongoing debate without any definitive consensus." The trial court also held that Petitioners' claim fails because of "Florida's strict separation-of-powers doctrine."

Nevertheless, given the lack of a final appellate ruling on the justiciability issue, the trial court—at great length—addressed the evidence. After determining that the burden was on Petitioners to show that Respondents' actions "are irrational or unconstitutional beyond a reasonable doubt," the trial court repeatedly discussed

the "weight of the evidence" and what the evidence showed for each of Petitioners'

major subdivisions of allegations. For example, the trial court concluded:

> The weight of the evidence shows that the State has made education a top priority both in terms of implementation of research-based education policies and reforms, as well as education funding. The State has an accountability and assessment system that is rated among the best in the nation, resulting in more "A" graded schools over time. The State has also adopted rigorous teacher certification, training and evaluation standards, resulting in over 94% of courses being taught by teachers who are "highly qualified" under federal standards.

Regarding funding, the trial court found, "based on the evidence presented, that

there is not a constitutional level lack of resources available in Florida schools."

More specifically, the trial court observed:

> With respect to funding, the evidence indicates that over the past twenty years, K-12 education has been the single largest component of the state general revenue budget. Even during the recent, severe economic downturn, the State ensured that education funding was less impacted than other government services and functions. In the current school year, the State funds education at the highest level in Florida history. Since the 1997-98 school year, education funding has outpaced inflation. The State has made efforts to equalize its funding and considers education costs for different student programs and cost-of-living differences across the state. It also is significant that the State has provided sufficient funding for schools to meet the class size requirements set forth in Article IX.[2]

---

2. As discussed below, article IX, section 1(a) was amended in 2002 to impose certain class size requirements and to require the Legislature to fund the costs associated with meeting those requirements.

The trial court also found that the State's "complex funding formula"—the Florida Education Finance Program—"is generally recognized as one of the most equalizing school funding formulas in the nation." The trial court also determined that "all of the school districts in Florida have excess capacity for generating revenue through local property taxes or sales surtaxes" and that "many" of the district witnesses cited "political" reasons for not doing so.

The trial court also addressed Petitioners' arguments regarding graduation rates, test results, and disparities among certain subgroups. After determining that the "most appropriate" examination of student performance is one that views that performance "over time and in context," the trial court described substantial, dramatic, and sustained improvements that have taken place in Florida since the late 1990's, including that "the high school graduation rate has increased by over 25 points, with more students of all racial, ethnic, and socioeconomic backgrounds graduating than ever before." The trial court also cited "dramatic" and sustained improvement on test results as measured by "a variety of measures, including national and international assessments." Regarding achievement and performance gaps, the trial court found that these gaps unfortunately "exist throughout the country," but that "Florida's gaps are smaller than the national gaps, and Florida has *outpaced the nation in closing these gaps*." (Emphasis added.) As one example, the trial court found that "Florida's students eligible for free-and-

reduced-price lunch ranked first in the nation, outperforming similar economically disadvantaged students in all other states."  As another example, the trial court found that during the relevant period, Florida was "the only state in the nation to narrow the achievement gap between White and Black/African-American students in both reading and mathematics in the fourth and eighth grades."  And as it relates to Petitioners' theory of the case—that is, the "need for more resources" argument—the trial court specifically found that Petitioners "*failed to establish any causal relationship* between any alleged low student performance and a lack of resources."  (Emphasis added.)  In the end, the trial court described an education system that is not perfect but that is working very well overall and has been "a top priority" of the State.

Finally, regarding the FTC and McKay programs, the trial court reiterated its prior rulings and found "no negative effect on the uniformity or efficiency of the State system of public schools due to these choice programs."

**The First District's Decision**

On appeal, the First District affirmed in all respects.  *Citizens*, 232 So. 3d at 1174.  The First District agreed with the trial court that Petitioners' arguments "raise political questions not subject to judicial review, because the relevant constitutional text does not contain judicially discoverable standards by which a court can decide whether the State has complied with organic law."  *Id.* at 1165.

- 13 -

The First District also agreed that Florida's "strict separation of powers . . . requires judicial deference to the legislative and executive branches to adopt and execute educational policies those branches deem necessary and appropriate to enable students to obtain a 'high quality' education." *Id.* at 1165-66. According to the First District, article IX, section 1(a) does not "empower judges to order the enactment of educational policies regarding teaching methods and accountability, the appropriate funding of public schools, the proper allowance of charter schools and school choice, the best methods of student accountability and school accountability, and related funding priorities." *Id.* at 1166.

The First District began by examining *Coalition* and its reference to the Supreme Court's analysis of the political question doctrine in *Baker v. Carr*, 369 U.S. 186 (1962). *Citizens*, 232 So. 3d at 1168. The First District explained how the instant case fell within *Baker*'s "*dominant considerations*" of "attributing *finality* to the action of the political departments and also the *lack of satisfactory criteria* for a judicial determination.' " *Id.* (quoting *Baker*, 369 U.S. at 210). Indeed, the First District noted that this case "consume[d] years in the court system . . . over the meaning of subjective and undefined phrases that might function to give guidance to political decision makers as laudable goals, but cannot guide judges in deciding whether a state or local government has in fact complied with the text." *Id.* at 1169.

The First District then explained how *Coalition* rejected a similar "blanket challenge to the adequacy of the education system." *Id.* at 1169-70. The First District noted that the plaintiffs in *Coalition* "failed to demonstrate any manageable standards that could be applied without 'a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature.'" *Id.* at 1170 (quoting *Coalition*, 680 So. 2d at 408). The First District agreed with the trial court that "'efficient' and 'high quality' are no more susceptible to judicial interpretation than 'adequate' was under the prior version of the education provision." *Id.*

The First District concluded that its holding was supported "by Florida's strict separation of powers doctrine and by the language of the amended constitutional article itself." *Id.* On the latter point, the First District noted that the 1998 amendments retained the language that "adequate provision shall be made *by law*," *id.* at 1171 (quoting art. IX, § 1(a), Fla. Const.), leading the First District to conclude "that the constitution continues to commit education policy determinations to the legislative and executive branches," *id.*

The First District "recognize[d] that courts in other states have sometimes purported to define" similar concepts in their education articles, but the First District concluded that those decisions were "insufficiently deferential to the fundamental principle of separation of powers . . . and the practical reality that

- 15 -

educational policies and goals must evolve to meet ever changing public conditions." *Id.* at 1172. The First District instead agreed with other courts that have declined to impose upon the legislature the court's view of "adequacy, efficiency, and quality." *Id.*[3]

## II. ANALYSIS

This Court is being asked to determine whether in this case we have been presented with a manageable standard for assessing—in the context of a blanket challenge to the constitutionality of the K-12 education system—whether the State has made "adequate provision" for an "efficient" and "high quality" system of education "that allows students to obtain a high quality education" under article IX, section 1(a) of the Florida Constitution. The trial court and the First District both held in the negative, relying on the reasoning in *Coalition*. This question presents

---

3. The First District specifically noted its agreement with the Pennsylvania Supreme Court's decision in *Marrero v. Commonwealth*, 739 A.2d 110, 112 (Pa. 1999). However, as Petitioners point out, the Pennsylvania Supreme Court had distanced itself from *Marrero* prior to the First District's decision. *See William Penn Sch. Dist. v. Pennsylvania Dep't of Educ.*, 170 A.3d 414, 457 (Pa. 2017) ("We find irreconcilable deficiencies in the rigor, clarity, and consistency of the line of cases that culminated in [*Marrero*].").

a pure issue of law that is subject to de novo review. *W. Fla. Reg'l Med. Ctr., Inc. v. See*, 79 So. 3d 1, 8 (Fla. 2012) ("Statutory and constitutional construction are questions of law subject to a de novo review."). We decline to address the other issues raised by Petitioners.[4]

We agree with the lower courts that Petitioners' blanket challenge does not survive the reasoning in *Coalition*, notwithstanding the 1998 amendments to article IX, section 1(a). Although we do not necessarily agree with what appears to be the district court's conclusion that an article IX challenge could never be justiciable, *see Coalition*, 680 So. 2d at 408 (declining to say "never"), we need not decide that issue. Instead, this case turns in part on Petitioners' failure to present the courts with any roadmap by which to avoid intruding into the powers of the other branches of government.

At the outset, we strongly reject any suggestion in the dissenting opinions that those of us agreeing to approve the result reached by the First District are shirking a constitutional duty or somehow care less than the dissenting justices about the education of Florida's children. Indeed, the refusal to recognize both the

---

4. Petitioners argue that the trial court incorrectly applied rational basis scrutiny and ask this Court to determine the appropriate standard and then remand so their claim can be reexamined under that standard. We find no need to address this argument. Petitioners also present arguments regarding the McKay and FTC programs. These arguments were not adequately preserved.

blanket nature of Petitioners' challenge and that this case amounts to a request for the courts to determine the appropriate amount of education funding explains in large part the asserted struggle to understand the "judicial universe" in which this case is being decided. Dissenting op. at 42, 64 (Pariente, J.).[5]

This suit began nearly a decade ago in what largely resembled a funding challenge to the "2009 Appropriations Act." Since then, not only has that appropriations act come and gone, but so too have many subsequent appropriations acts. Moreover, in that same time span, the Legislature has revised—on more than one occasion—the standards and assessments complained of by Petitioners. And the trial court explained how the State's process for developing, administering, scoring, and reporting is "an inclusive process involving Florida educators all along the way." The point being, the education system—and education policy itself—does not remain static and is instead continually being shaped by various

---

5. The dissent disputes the notion that Petitioners' claim is a " 'blanket challenge' to the entire state education system." Dissenting op. at 46 (Pariente, J.). But the blanket nature of Petitioners' claim is not reasonably in dispute. The original trial judge recognized that Petitioners sought "system-wide declaratory and supplemental relief." The trial judge who later rendered Final Judgment recognized that Petitioners "have 'made a blanket assertion that the entire system is constitutionally inadequate.' " (Quoting *Coalition*, 680 So. 2d at 406.) And the First District recognized that Petitioners "assert[ed] that the State's entire K-12 public education system . . . is in violation of the Florida Constitution." *Citizens*, 232 So. 3d at 1165. The attempt by the dissenters to recharacterize this case is totally at odds with the way this case has been presented by Petitioners.

interested parties. Thus, Petitioners' challenge is fundamentally different than a challenge to a specific program or a specific funding issue. In effect, Petitioners ask this Court to declare the current educational system unconstitutional based on years-old evidence.

In any event, to explain why we approve the result reached by the First District, we begin by reviewing this Court's 1996 decision in *Coalition*. We then examine certain subsequent amendments to and failed attempts to amend article IX, section 1, including the adopted 1998 amendments at issue. We then examine this Court's more recent decision in *Holmes*. We conclude by explaining why Petitioners fail to overcome *Coalition*. As this Court did in *Coalition*, we decline to look to other jurisdictions. *Coalition*, 680 So. 2d at 404-05. Instead, we look to the language of the Florida Constitution and this Court's decisions.

### *Coalition*

In *Coalition*, this Court addressed a similar challenge to the "adequacy" of the entire school system, but one brought under the pre-1998 article IX, section 1. *Coalition*, 680 So. 2d 400. The appellants in *Coalition* sought a declaration "that an adequate education is a fundamental right under the Florida Constitution, and that the State has failed to provide its students that fundamental right by failing to allocate adequate resources for a uniform system of free public schools." *Id.* at 402. Among other things, the allegations focused on purported inadequacies

relating to certain subgroups of students. *Id.* The trial court dismissed the complaint with prejudice, and this Court affirmed. *Id.*

*Coalition* began by exploring the history of Florida's education article, noting among other things that the Constitution was amended in 1868 to provide that it was "the *paramount* duty of the State to make ample provision for the education of all the children," and that the "paramount duty" language was subsequently deleted in 1885. *Id.* at 405.[6] *Coalition* then examined the language of the present education article, noting that "adequate provision" had not been defined but that this Court had on numerous occasions "attempted to define" the phrase "uniform system of free public education." *Id.* at 406. In doing so, this Court noted that those prior cases all involved "an objection to some specific funding issue," as opposed to "a blanket assertion" against the adequacy of "the entire [education] system." *Id.* Recognizing the nature of the case as a challenge to the Legislature's overall funding of education, this Court ultimately agreed with the trial court that "the courts cannot decide whether the Legislature's appropriation of funds is adequate in the abstract, divorced from the required

---

6. In a footnote, *Coalition* referenced a "four-category system" developed by certain scholars that "attempt[s] to measure the level of duty imposed on the state legislature" depending upon the language of the state's education clause. *Coalition*, 680 So. 2d at 405 n.7. *Coalition* then contrasted Florida's 1868 education clause with the "present educational clause." *Id.*

uniformity" because doing so "would necessarily" require the courts "to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them." *Id.* at 406-07 (quoting trial court's order). This Court further agreed that "if the Court were to declare present funding levels 'inadequate,' presumably the Plaintiffs would expect the Court to evaluate, and either affirm or set aside, future appropriations decisions." *Id.* at 407 (quoting trial court's order).

*Coalition* then more directly addressed the separation of powers doctrine, explaining that the appellants' funding challenge implicated constitutional provisions other than just article IX. Indeed, after noting that the separation of powers doctrine was "expressly set[] forth" in article II, section 3 and that article VII, section 1(c) "expressly reserve[s] to the legislative branch" the power to appropriate funds, this Court concluded that "an insufficient showing has been made to justify judicial intrusion" into the Legislature's appropriations power. *Id.* at 407-08. This Court further concluded that, unlike the term "uniform," the term " 'adequacy' simply does not have such straightforward content." *Id.* at 408. This Court thus agreed with the appellees' reliance on *Baker*, in which the Supreme Court "set forth six criteria to gauge whether a case involves a political question," including "(1) a textually demonstrable commitment of the issue to a coordinate

- 21 -

political department; [and] (2) a lack of judicially discoverable and manageable standards for resolving it." *Id.* *Coalition* summed up:

> While we stop short of saying "never," appellants have failed to demonstrate in their allegations, or in their arguments on appeal, an appropriate standard for determining "adequacy" that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing *by law* for an adequate and uniform system of education).

*Id.* In doing so, this Court stated "that the legislature has been vested with *enormous discretion* by the Florida Constitution to determine what provision to make for an adequate and uniform system of free public schools." *Id.* (emphasis added).

In a concurring opinion, Justice Overton agreed with the majority that an insufficient showing had been made to justify judicial intrusion but wrote separately to express his view that the majority's holding does not preclude the judiciary from being involved in the enforcement of article IX, section 1. *Id.* at 408 (Overton, J., concurring). Justice Overton opined that although the education article "does not ensure a perfect system" or "guarantee[] a perfect or ideal education," it also "does not preclude the treatment of education as an essential, fundamental right." *Id.* at 409 (Overton, J., concurring). And Justice Overton suggested that the term "adequate" must have some "minimum threshold . . . below which the funding provided by the legislature would be considered 'inadequate.' "

*Id.* As an example, Justice Overton suggested that an allegation of "a thirty percent illiteracy rate" in a county would "at least state[] a cause of action." *Id.*[7]

In a dissenting-in-part opinion joined by two other justices, Justice Anstead argued that, given the "comprehensive allegations of inadequacies set out in appellants' complaint," the appellants should have been permitted to establish a factual context and that this Court had "failed to carry out its duty to ensure that the legislature has performed its constitutional mandate." *Id.* at 410 (Anstead, J., dissenting in part). Justice Anstead also emphasized the importance of education, positing that "[s]urely all would agree that education is a fundamental value in our society." *Id.* In Justice Anstead's view, the education article "recognized the fundamental value of education," and there was no need "to add 'puffing' words to suggest the quality of the system contemplated." *Id.* at 410-11 (Anstead, J., dissenting in part).

**Failed 1997 Amendment to Article IX**

One year after *Coalition*, this Court addressed an initiative petition that sought to amend article IX, section 1 by defining "[a]dequate provision for funding public education" to mean a minimum percentage (40%) of total appropriations.

---

7. The trial court here directly addressed Justice Overton's "excellent example of why the judicial branch should never say never," finding that "[t]his case is not about a significant level of illiteracy."

*Advisory Op. to the Att'y Gen. re Requirement for Adequate Pub. Educ. Funding*, 703 So. 2d 446, 447 (Fla. 1997). This Court struck the proposed amendment as violative of the single subject requirement of article XI, section 3. *Id.* at 448. This Court found that the amendment "arbitrarily" and "substantially affects . . . other functions" of government in Florida, including "various vital functions." *Id.* at 449. This Court also noted the proposed amendment's impact on the "functions of executive approval and veto" set forth in article III, section 8. *Id.*

**The 1998 Amendments to Article IX**

In 1998, the CRC proposed and the voters approved the changes to article IX, section 1 at issue here. The 1998 amendments did not adopt Justice Overton's view in *Coalition* and declare education to be a "fundamental right." *Coalition*, 680 So. 2d at 409 (Overton, J., concurring). Instead, the amendments stated that education of children is "a fundamental value of the people," tracking some of the language in Justice Anstead's dissenting-in-part opinion in *Coalition*. *See id.* at 410 (Anstead, J., dissenting in part). The 1998 amendments also returned the "paramount duty" language to the education article, although the amendments— presumably in recognition of the Legislature's need to fund "the various vital functions of State government, including not only education," *Advisory Op. to the Att'y Gen. re Requirement for Adequate Pub. Educ. Funding*, 703 So. 2d at 449— described the State's duty to make adequate provision as "a paramount duty,"

whereas the 1868 Constitution described the duty as "the paramount duty." Finally, the 1998 amendments added words such as "efficient" and "high quality" to describe the contemplated system of free public schools.

Members of the 1998 CRC submitted competing amicus briefs in this case. On the one hand, some of the members assert that one of the goals of the 1998 amendments was "to provide a judicially-enforceable right to a public school system that is 'uniform, efficient, safe, secure, and high quality.' " On the other hand, other members argue that "common sense" indicates that "the ambiguous terms 'high quality' and 'efficient' " were used to "set forth aspirational goals" and "to avoid litigation of the type brought in this case."

### 2002 Amendment to Article IX—Class Size Reduction

In 2002—before any judicial interpretation of the term "high quality"— article IX, section 1(a) was amended by initiative petition. The 2002 amendment set a maximum number of students per classroom for various grade levels. *See Advisory Op. to the Att'y Gen. re Florida's Amend. to Reduce Class Size*, 816 So. 2d 580, 581-82 (Fla. 2002). The 2002 amendment also established a phase-in period and expressly provided that the costs associated with meeting the class size reductions were to be borne by "the legislature"—i.e., "the state"—as opposed to the "local school districts." *Id.* at 581. The 2002 amendment also directly referenced the term "high quality" added to article IX, section 1(a) in 1998:

> *To assure that children attending public schools obtain a high quality education, the legislature shall make adequate provision* to ensure that . . . there are a sufficient number of classrooms . . . .

(Emphasis added.) This Court upheld the validity of the initiative petition. *Id.* at 585-86.

Here, there is no suggestion that the Legislature failed to "make adequate provision" for the reduction of classroom sizes. On the contrary, the trial court found it "significant that the State has provided sufficient funding for schools to meet the class size requirements set forth in Article IX." In arguing to this Court that "high quality" is a judicially manageable standard for measuring the State's compliance with article IX, Petitioners make no mention of the 2002 amendment and the fact that the citizens constitutionalized a specific statewide policy with funding mandate "[t]o assure that children attending public schools obtain a high quality education." *See Holmes*, 919 So. 2d at 407 ("[W]hen the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive . . . ." (quoting *Weinberger v. Bd. of Pub. Instruction*, 112 So. 253, 256 (Fla. 1927))). And in effectively urging the adoption of Petitioners' argument, the dissent references "basic rules of statutory construction," dissenting op. at 60 (Pariente, J.), and yet—like Petitioners—ignores the language added to article IX in 2002. We are unaware of any principle of statutory construction that supports Petitioners' and the dissent's approach.

### *Holmes*

In 2006, this Court in *Holmes* addressed article IX, section 1(a) but not in the context of a blanket challenge to the K-12 system. Rather, *Holmes* involved a challenge to a specific voucher program known as the Opportunity Scholarship Program (OSP), under which any student from a "fail[ing]" public school could either move to a different, non-failing public school or "receive funds from the public treasury, which would otherwise have gone to the student's school district, to pay the student's tuition at a private school." *Holmes*, 919 So. 2d at 397. The "narrow question" in *Holmes* was whether that second option involving the use of public funds was prohibited by article IX, section 1(a). *Id.* at 397-98. *Holmes* answered in the affirmative, concluding that the OSP "diverts public dollars into separate private systems parallel to and in competition with the free public schools that are the sole means set out in the Constitution for the state to provide for the education of Florida's children" and that the OSP "funds private schools that are not 'uniform' when compared with each other or the public system." *Id.* at 398.

As *Coalition* did previously, *Holmes* examined the history of Florida's education article. In doing so, *Holmes* noted that the 1998 amendments were made "in response in part to *Coalition* . . . to make clear that education is a 'fundamental value' and 'a paramount duty of the state,' and to provide standards by which to measure the adequacy of the public school education provided by the state." *Id.* at

403. *Holmes* also cited certain commentary from individuals involved with the 1998 CRC explaining that the 1998 amendments represented "an attempt" to provide measurable standards. *Id.* at 404. *Holmes* later recognized the 1998 amendments as "imposing a maximum duty on the state to provide for public education that is uniform and of high quality." *Id.* And *Holmes* later described article IX, section 1(a) as "provid[ing] a comprehensive statement of the state's responsibilities regarding the education of its children." *Id.* at 408.

Although *Holmes* recognized the usual framework of the presumptive constitutionality of statutes, *Holmes* ultimately invalidated the OSP because it was "in direct conflict with the mandate in article IX, section 1(a)." *Id.* at 405. *Holmes* explained that article IX, section 1(a) contained not just a mandate to make adequate provision for the education of all children, but also a restriction that the mandate be fulfilled solely by means of a system of free public schools. *Id.* at 407. In other words, the constitutional provision "does not authorize additional equivalent alternatives." *Id.* at 408.

**The Reasoning and Result in *Coalition* Defeat Petitioners' Challenge**

In *Coalition*, this Court upheld a dismissal with prejudice of a blanket challenge to the "adequacy" of the entire K-12 system—a challenge that bears a close resemblance to the challenge here. 680 So. 2d at 402. This Court rejected the challenge in part because the phrase "adequate provision" did not have

"straightforward content." *Id.* at 408. In doing so, this Court explained that previous cases attempting to interpret the education article all involved some "specific" challenge. *Id.* at 406. This Court thus balked at the possibility of intruding into the powers of the other branches, including possibly being expected "to evaluate, and either affirm or set aside, future appropriations decisions." *Id.* at 407 (quoting trial court's order). However, this Court refused to say "never." *Id.* at 408. Rather, the case turned on the challengers' "fail[ure] to demonstrate . . . an appropriate standard . . . that would not present a substantial risk of judicial intrusion." *Id.*

In his concurring opinion, Justice Overton agreed with the majority "that an insufficient showing has been made by the appellants to justify a judicial intrusion under the circumstances of this case." *Id.* at 408 (Overton, J., concurring). He went on to add that, in his view, the holding of the Court "does not mean that the judiciary should not be involved in the enforcement of this constitutional provision." *Id.*

In sum, although recognizing the possibility that some future case might present a justiciable claim under article IX, section 1, a majority of the Court determined that the *Coalition* appellants had not presented such a claim. There is no basis for concluding that Petitioners here have been any more successful in framing a claim that is justiciable.

The 1998 amendments to article IX, section 1 undoubtedly heightened the Legislature's mandate to "a paramount duty."  But the fact that the Legislature's duty to make "adequate provision" was heightened does not in and of itself provide the courts with "an appropriate standard for determining 'adequacy.' "  *Coalition*, 680 So. 2d at 408.  Rather, the primary issue here is whether the term "high quality" provides such a standard.  Although *Holmes* spoke of the 1998 amendments as "provid[ing] standards by which to measure the adequacy of the public school education provided by the state," 919 So. 2d at 403, that language has no relevance here.  *Holmes* did not involve a blanket "adequacy" challenge and did not remotely address the issue of whether the entire K-12 system was "efficient" or of "high quality."  Instead, *Holmes* addressed a "narrow question," *id.* at 397, involving a specific voucher program and turned on other language in article IX, primarily "system of free public schools."  In other words, *Holmes* in no way answers the question presented.[8]

Looking to the language of article IX, section 1(a), we conclude that the term "high quality" in and of itself does not have "straightforward content,"

_____

8. We disagree with the dissent's suggestion that the reasoning of *Holmes* was intended to and should apply to the type of blanket challenge brought in this case.  Dissenting op. at 51 (Pariente, J.).  Not only did *Holmes* expressly note the "narrow" scope of the issue presented in that case, *Holmes*, 919 So. 2d at 397, but *Holmes* turned on language in article IX that long predated the 1998 amendments.

- 30 -

*Coalition*, 680 So. 2d at 408, at least in the context of a blanket challenge to the adequacy of the entire K-12 system. Indeed, "high quality" can reasonably be viewed as "puffing." *Id.* at 411 (Anstead, J., dissenting in part). It is thus hardly surprising that article IX, section 1(a) was subsequently amended in 2002 to constitutionalize a *specific statewide policy*—a classroom-size policy—along with a funding directive to "assure that children attending public schools obtain a high quality education." Art IX, § 1(a), Fla. Const.; *see Reduce Class Size*, 816 So. 2d 580.

Putting aside the class size amendment, Petitioners simply cannot overcome this Court's reasoning and the result in *Coalition*. As in *Coalition*, they have failed to present the courts with any manageable standard by which to avoid judicial intrusion into the powers of the Legislature. Moreover, we find that the standard actually proposed by Petitioners for measuring the Legislature's compliance with article IX, section 1(a) is foundationally flawed.

Petitioners' argument largely is that the constitutional test "for measuring whether the State is providing an opportunity for a high quality education" should be based solely on the assessment results that measure whether students have learned the core content standards established by the Legislature. In other words, Petitioners do not ask this Court to define "high quality." Rather, they assert that the Legislature itself has already defined "high quality" and how to measure it.

- 31 -

They thus allege that the educational system is constitutionally inadequate because the "assessment results show low achievement and wide disparities," particularly "for children experiencing poverty or attending school in poorer school districts."

Petitioners essentially ask this Court to constitutionalize the Legislature's own standards, which in part serve as goals. We reject that argument. In effect, Petitioners' argument is that a "high quality" system is whatever the Legislature says it is, so long as some acceptable—yet unknown—percentage of all subgroups of students achieve a satisfactory level of "3" on the assessment. Nothing in the language of article IX, section 1(a) supports Petitioners' argument. Nor does this Court's case law. Moreover, as amicus Foundation for Excellence in Education logically points out, "adopting State standards as constitutional minima would have the perverse effect of encouraging the *weakening* of curriculum standards in order to achieve higher passage rates and to satisfy court-imposed requirements." *See* Br. of Amicus Foundation for Excellence in Education in Support of Respondents, at 13-14 (explaining how this phenomenon occurred in the wake of the federal No Child Left Behind Act of 2001).[9]

---

9. The dissent attempts to undercut amicus's sound logic in part by stating that amicus was "founded by former Governor Jeb Bush" and citing the website "conservativetransparency.org" to support the assertion that amicus's mission is to privatize schools. Dissenting op. at 54 n.18 (Pariente, J.). We disagree with the dissent's ad hominem approach to challenging logic and reason, an approach that not so subtly attempts to drag politics into judicial decision making.

Not only do Petitioners conflate constitutional requirements with legislative standards, they also ignore—as do the dissenters—that in the years since this suit was first filed, the Legislature has revised the complained-of standards and assessments on more than one occasion. Moreover, Petitioners' argument flies in the face of the trial court's detailed findings, none of which Petitioners challenge for lacking a basis in the record. As just a few examples, the trial court found that: "Florida has been a national leader in education reform"; Florida *intentionally* adopted rigorous standards and set cut scores at a level that places the majority of students below the satisfactory level; scoring a "Level 1 or 2" on the assessment "is not an indication that a student 'can't read' or is illiterate"; the State's "high performance standards . . . have led to improvement over time"; and Florida "has outpaced the nation in closing" achievement and performance gaps that "exist throughout the country."

While Petitioners' proposed standard is problematic in and of itself, Petitioners' own pleadings expose the flaws in their arguments and highlight why *Coalition* requires that we approve the result reached by the First District. Indeed, what Petitioners seek is for the courts to order Respondents "to establish a remedial plan that . . . includes *necessary studies to determine what resources and standards are necessary* to provide a high quality education to Florida students." (Emphasis added.) In other words, Petitioners do not know what a "high quality system"

looks like, how it can be achieved, or what resources and standards are necessary. Instead, they—and presumably the courts—will know an "efficient" and "high quality" system, as well as an "adequate" level of overall funding, when they see a study that shows what it is. Petitioners invite this Court to not only intrude into the Legislature's appropriations power, *see Coalition*, 680 So. 2d at 407 ("[P]resumably the Plaintiffs would expect the Court to evaluate, and either affirm or set aside, future appropriations decisions . . . ."), but to inject itself into education policy making and oversight. We decline the invitation for the courts to overstep their bounds.

Even if we were inclined to accept all of Petitioners' arguments regarding justiciability and separation of powers, on the record presented here Petitioners still could not prevail. At bottom, Petitioners' blanket challenge to the educational system is a funding challenge, one rooted in the notion that the Legislature is not providing an adequate overall level of funding and that the lack of funding has resulted in disproportionate outcomes for certain students. That is clear from Petitioners' allegations, Petitioners' specific request for relief, and the rest of the record. Indeed, the trial court noted, among other things, that "[t]he primary thrust of [Petitioners'] complaint is that there is a crisis . . . caused by the State of Florida's inadequate funding of education," that Petitioners "asserted that more resources were clearly needed to address the problems they identified in their

complaint," and "that the evidence was focusing on [Petitioners'] 'need for more resources' argument." But the trial court's express findings doom Petitioners' funding challenge and theory of the case. Not only did the trial court find that Petitioners "failed to establish any causal relationship between any alleged low student performance and a lack of resources," but the trial court found that "the weight of the evidence . . . establishes a *lack* of any causal relationship between additional financial resources and improved student outcomes." Petitioners' failure to establish such a causal relationship provides an independent basis for rejection of their claims.[10]

### III. CONCLUSION

Given the blanket nature of Petitioners' challenge, the trial court's extensive and detailed findings after Petitioners were permitted to establish a factual record, and the failure of Petitioners to provide any manageable standard to support their challenge to the adequacy of the funding of the entire K-12 education system, we approve the result reached by the First District in affirming the trial court's rejection of Petitioners' challenge.

It is so ordered.

---

10. The dissent disagrees that Petitioners' failure on this point provides an independent basis for rejecting Petitioners' claims. Dissenting op. at 61 (Pariente, J.). The dissent simply fails to acknowledge what indisputably is the "primary thrust" of this case.

CANADY, C.J., and LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.
CANADY, C.J., concurs with an opinion, in which LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.
LABARGA, J., concurs in result only.
PARIENTE, J., dissents with an opinion, in which LEWIS and QUINCE, JJ., concur.
LEWIS, J., dissents with an opinion, in which PARIENTE and QUINCE, JJ., concur.
POLSTON, J., recused.

NO MOTION FOR REHEARING WILL BE ALLOWED.

CANADY, C.J., concurring.

The manifest goal of the Petitioners and the dissenting justices is to put educational funding and educational policy firmly under the control of the judiciary. That is the only possible path forward once a judicial decision is made that "the State has failed to ensure that its allocations are the best use of funding," that "the State is not funding schools in an efficient manner," and that the State has not "allocate[d] resources in a productive manner and without waste." Dissenting op. at 58-59 (Pariente, J.). The response to such a judicial decision would involve judicial control of educational funding levels and judicial control of how educational funds are used. There is no reason to believe that the judiciary is competent to make these complex and difficult policy choices. And there is every reason to believe that arrogating such policy choices to the judiciary would do great violence to the separation of powers established in our Constitution.

- 36 -

Contrary to the position of the Petitioners and the dissenters, the addition to the Constitution of the capaciously vague terms "efficient" and "high quality" cannot be understood to have wrought a revolution in the separation of powers. I therefore fully concur with the plurality opinion's view that going down the path charted by the Petitioners and the dissenters would be inconsistent with this Court's precedent in *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles*, 680 So. 2d 400 (Fla. 1996), that requires judicially manageable standards in order for the judiciary to intervene.

In striking down a delegation of legislative power to the executive, we previously held that "[t]he legislative responsibility to set fiscal priorities through appropriations is totally abandoned when the power to reduce, nullify, or change those priorities is given over to the total discretion of another branch of government." *Chiles v. Children A, B, C, D, E, & F*, 589 So. 2d 260, 265 (Fla. 1991). We recognized the fundamental point that "[u]nder any working system of government, one of the branches must be able to exercise the power of the purse, and in our system it is the legislature, as representative of the people and maker of laws, including laws pertaining to appropriations, to whom that power is constitutionally assigned." *Id.* at 267. We emphasized the importance of this unique role played by the Legislature in controlling state spending:

> The constitution specifically provides for the legislature alone
> to have the power to appropriate state funds. More importantly, only

the legislature, as the voice of the people, may determine and weigh the multitude of needs and fiscal priorities of the State of Florida. The legislature must carry out its constitutional duty to establish fiscal priorities in light of the financial resources it has provided.

*Id.*

Of course, this does not mean that the judiciary in adjudicating individual constitutional claims can never make decisions that have an impact on state spending. But it does mean that the judiciary cannot take over the appropriations process and policymaking concerning the use of state funds for the public school system. If the judiciary does so, it strikes a grievous blow against the constitutional separation of powers. And that is exactly what the Petitioners and the dissenters would have us do. This is not a case in which a constitutional attack is made on specific identified actions of the government that have violated the Constitution. Instead, it is a challenge based on particular conditions that allegedly offend the Constitution and that are assumed to result from a complex series of deficient actions of the State—involving appropriations and the use of appropriated funds—that remains unidentified.

At its core, this is a case in search of a remedy. Or more to the point, it is a case in search of a remediator. In brief, the Petitioners and the dissenters take the position that educational funding and policy in Florida are not working as well as they should, and that the judiciary should figure out how funding and policy can work better. The judiciary is very good at making certain types of decisions—that

is, judicial decisions. But it lacks the institutional competence—or the constitutional authority—to make the monumental funding and policy decisions that the Petitioners and the dissenters seek to shift to the judicial branch. And there is not a hint of any manageable judicial standards to apply in making those decisions. Instead, if the Petitioners and the dissenters had their way, judges would simply apply their own policy preferences. This collides with the basic principle of our constitutional structure that "[t]he judicial power of the state extends" only to "controversies justiciable in their nature." *Burnett v. Greene*, 122 So. 570, 575 (Fla. 1929).

The Supreme Court has held that the doctrine of justiciability can require the rejection of "a broad call on judicial power to assume continuing regulatory jurisdiction over the activities" of a coordinate branch of government. *Gilligan v. Morgan*, 413 U.S. 1, 5 (1973). Such "continuing regulatory jurisdiction" exercised by the judiciary over educational spending and policymaking is exactly what is at issue in this case. Here, this Court properly turns aside the quest of the Petitioners and the dissenters for "the assumption of a continuing judicial review of substantive political judgments entrusted expressly to" a coordinate branch of government. *Id.* at 11. This result is required by the fundamental structure of our constitutional system and by the very nature of judicial power.

LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.

PARIENTE, J., dissenting.

I dissent. With its decision today, the majority of this Court fails to provide any judicial remedy for the students who are at the center of this lawsuit—African-American students, Hispanic students, economically disadvantaged students, and students who attend school in poorer school districts or attend persistently low-performing schools. The majority of this Court eviscerates article IX, section 1, of the Florida Constitution, contrary to the clear intent of the voters, and abdicates its responsibility to interpret this critical provision and construe the terms "uniform," "efficient," and "high quality," enshrined in that provision. Today, even more emphatically than before the 1998 amendment to article IX, section 1, I echo the words of Justice Anstead, joined by Justices Kogan and Shaw: "By [the Court's] action today, we have reduced to empty words a constitutional promise to provide an adequate educational system for our children." *Coalition for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 410 (Fla. 1996) (Anstead, J., dissenting).

Article IX, section 1 became one of the strongest education provisions in the country when, in 1998, the voters of this State approved an amendment, which designated the education of children "a fundamental value of the people of the State of Florida" and placed "a paramount duty [on] the state" to provide a "uniform, efficient, safe, secure, and high quality system of free public schools"

- 40 -

for Florida's students.  Art. IX, § 1(a), Fla. Const.  That amendment, a product of the 1998 Constitution Revision Commission, was intended to remedy the Court's 1996 opinion in *Coalition*, which held that article IX, section 1 did not provide judicially manageable standards for the courts to adjudicate claims brought under the provision.  680 So. 2d at 407-08.

In this case, Petitioners—a group of public school parents, students, and citizen organizations—brought a declaratory action against the State, alleging that the State is violating its constitutional obligation to provide all students with a uniform, efficient, and high quality education system.  The trial court held a four-week long bench trial, at which evidence was presented that, in 2014, only 58% of Florida students across all grades scored on grade level on statewide reading assessments; that number was only 56% for statewide math assessments.  Petrs.' Initial Br. at 4.[11]  To properly understand these statistics, "grade level" means only that a student's performance is at least "satisfactory;"[12] which also signifies that the student "may need additional support for the next grade/course."[13]  These

11.  2014 provides the most recent results from the record.  *See* Petrs.' Initial Br. at 4.

12.  § 1008.22(3)(e)1., Fla. Stat. (2018); *see id.* § 1008.34(1)(a).

13.  Florida Standards Assessments, *Understanding Florida Standards Assessments Reports* 4 (2018), https://fsassessments.org/core/fileparse.php/4344/urlt/Understanding_FSA_Reports_2018_041918_Final.pdf.

figures are on average lower for African-American students, Hispanic students, and economically disadvantaged students.

In what judicial universe do the facts presented demonstrate that the State is fulfilling its constitutional obligation to provide a "uniform," "efficient," and "high quality" education?[14] By holding that a claim like Petitioners'—which alleged wide disparities in performance among certain subgroups of students and persistently low-performing schools—cannot be adjudicated by the courts, the majority of this Court renders article IX, section 1, a "hollow phrase[] of nothingness." Dissenting op. at 79 (Lewis, J.). Indeed, the effect of the plurality's holding is to deny Petitioners the opportunity to establish in a court of law that the State has failed to live up to its paramount constitutional obligation set forth in article IX, section 1.[15]

---

14. Although counsel for the Department of Education alleged during oral argument that student performance in Florida is superior to student performance in New Jersey, where the New Jersey Supreme Court first granted relief in *Abbott v. Burke*, 575 A.2d 359 (N.J. 1990), the facts show otherwise. According to the 2017 report card issued by the Education Week Research Center, New Jersey ranked second in the nation overall in education, while Florida ranked 29th. *See* Samuel Stebbins & Thomas C. Frohlich, *Geographic Disparity: States with the Best (and Worst) Schools*, USA Today (Feb. 8, 2018), https://www.usatoday.com/story/money/economy/2018/02/08/geographic-disparity-states-best-and-worst-schools/1079181001/.

15. The plurality refuses to look at the jurisprudence of other state supreme courts addressing similar constitutional provisions. And, while Florida's education system should not necessarily be compared to other states, it is worth noting that, as of February of this year, Florida's education system ranks 29th in the country.

For these and all the reasons that follow, I dissent from the conclusion of the majority of this Court that the claim raised by Petitioners in this case is not justiciable.  I also concur with Justice Lewis's excellent explanation of justiciability and why this particular controversy is justiciable.  *See generally* dissenting op. (Lewis, J.).

**Petitioners' Claim**

The plurality opinion is premised on a basic mischaracterization of Petitioners' claim as one to "have the State of Florida's K-12 public education system declared unconstitutional."  Plurality op. at 1.  This mischaracterization sets the stage for the rest of the plurality's opinion, including its conclusion that Petitioners' claim is non-justiciable.

Contrary to the plurality's contention, Petitioners' claim is not "a blanket challenge to the constitutionality of the K-12 education system."  Plurality op. at 16.  Rather, Petitioners allege that the State has violated its constitutional obligation under article IX, section 1 in specific ways.  Most notably, Petitioners

Stebbins & Frohlich, *supra* note 14.  This ranking is based in part on the fact that "Florida's public schools receive some of the lowest funding of any state school system in the country."  *Id.*  In fact, Florida's per-pupil spending falls well below the national average.  *Map: Per-Pupil Spending, State-by-State*, Educ. Week (June 6, 2018), https://www.edweek.org/ew/collections/quality-counts-2018-state-finance/map-per-pupil-spending-state-by-state.html.  Indeed, the national average is $12,256 per student, while Florida spends a mere $9,737 per student.

allege that the State has failed to address wide disparities in performance among certain subgroups of students—specifically, African-American students, Hispanic students, students experiencing poverty, and students attending school in poorer school districts—as well as persistently low-performing schools. In support of their claim, Petitioners set forth detailed statistics, which show, for example, "disparities in reading achievement by subgroup as only 38% of Black students passed reading; 54% of Hispanic students; 19% of English Language Learners (ELL); 47% of students receiving Free-Reduced Lunch (FRL) (a proxy for poverty); and 37% of homeless students." Petrs.' Initial Br. at 4 (footnotes omitted). These statistics demonstrate that disparities do not just exist among certain subgroups of students, but also between school districts. For example:

> The statewide average passing rate for reading for third graders is 56%, and 55% for tenth graders. In St. Johns, 76% of third graders and 75% of tenth graders passed reading. Hamilton has the lowest overall reading passing rate for third graders at 35% of students. The lowest reading rate for tenth graders was Gadsden with 26%. Thus, the difference in reading rates among districts in third grade is 41 percentage points, and 49 in tenth grade.
> On the 8th grade math assessment, Bradford had the lowest passing rate at 5% overall, 0% for Black students, 6% for FRL, and 0% for students with disabilities.
> In 2015, Franklin had the lowest graduation rate at 49%, and three other school districts were below 60%. In contrast, St. Johns and three other districts had graduation rates over 90%, and Dixie had the highest at 96.9%. The difference in graduation rates between Franklin and Dixie was almost 48 percentage points. One of the State's measures of college readiness shows a statewide average of 27%, with disparities ranging from St. Johns at 55% versus Hamilton with 1%.

*Id.* at 5 (footnotes omitted). The accuracy of these statistics are not challenged.

Further, Petitioners set forth statistics showing that, among other things, "28 schools (all serving high poverty students) . . . are persistently low-performing (5 or more years as F)." *Id.* at 6. In fact, despite concluding that Petitioners' claim was non-justiciable, the trial court in this case expressed particular concern about the issue of persistently low-performing schools:

> [T]he Court must note that it was surprised at how long a school could remain in "F" status pursuant to the enactments of the legislature. If there is one area that this Court was most concerned about based on the evidence heard, it is in the area of Differentiated Accountability. There can be little doubt that allowing a school to remain in F status for an extended period of time raises serious issue regarding the constitutional acceptance of such an event. . . . To bring the matter to a point, I would raise the following question. How many people would want a judge deciding or presiding over their lawsuit in a Circuit that had been rated by the Supreme Court with an "F" as to judicial performance for many years? Similarly, parents do not want their children attending a school that continues to receive an "F" based on its performance rating. The evidence presented, while not rising to the level of a constitutional violation, should serve as a warning not to be complacent about a local districts [sic] failure to address long term "F" schools. This is especially true since the Defendants [sic] own evidence shows that an "F" school can be turned around without additional resources being provided.

Final J. at 13-14.

The trial court also expressed concern over the State's "handling of local School Districts [sic] failure to address the problem of long term 'F' schools at the local level," stating that "[a]t some point in time the State Board should do more if

the local School District will not." Findings of Fact at 70. Thus, contrary to the plurality's contention, Petitioners' claim is not a "blanket challenge" to the entire state education system but, rather, a claim that the State is violating its constitutional obligation in specific ways—most significantly, by failing to address wide disparities in performance among certain subgroups of students and schools.

**Petitioners' Claim Brought Under Article IX, Section 1 Is Justiciable**

I completely agree with Justice Lewis that this Court "ha[s] a responsibility to interpret and apply the rights and principles set forth in the Constitution, including article IX, section 1(a)." Dissenting op. at 69 (Lewis, J.). This responsibility includes adjudicating controversies brought under article IX, section 1.

To conclude that the claim presented is not capable of judicial resolution would "reduce to empty words a constitutional promise to provide an adequate educational system for our children." *Coalition*, 680 So. 2d at 410 (Anstead, J., dissenting). While deference to the Legislature and separation of powers are clearly important constitutional principles, this Court cannot use those principles to escape its obligation to interpret provisions of the Florida Constitution and enforce the rights it grants to the citizens of this state. *See League of Women Voters v. Detzner*, 172 So. 3d 363, 400 (Fla. 2015) ("While the Legislature is generally entitled to deference as a result of its role in the redistricting process, that

- 46 -

deference applies only 'so long as [its redistricting] decision[s] do[ ] not violate the constitutional requirements." (alterations in original) (quoting *In re Senate Joint Res. of Legislative Apportionment 1176*, 83 So. 3d 597, 599 (Fla. 2012) (*Apportionment I*))).

In 2012, for example, this Court was tasked with defining for the first time the new standards set forth in the Fair Districts Amendment, which had been approved by voters two years earlier. *See generally Apportionment I*, 83 So. 3d 597. This Court did not shy away from the task, but rather recognized its "extremely weighty responsibility" entrusted to it "by the citizens of this state through the Florida Constitution to interpret the constitutional standards and to apply those standards to the legislative apportionment plans." *Id.* at 599. Just as the Court was able to define the terms in the Fair Districts Amendment, it is equally able to define the terms in article IX, section 1.

In concluding that Petitioners' claim is not justiciable, the First District Court of Appeal "respectfully disagree[d]" with other state supreme courts that have found similar claims justiciable. *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 232 So. 3d 1163, 1172 (Fla. 1st DCA 2017). Instead, the First District relied on *Marrero v. Commonwealth*, 739 A.2d 110, 112-13 (Pa. 1999), where the Pennsylvania Supreme Court held that such a claim was non-justiciable. *See Citizens for Strong Sch.*, 232 So. 3d at 1172. Three months before the First

- 47 -

District's decision, however, the Pennsylvania Supreme Court declined to follow its decision in *Marrero* and held that Petitioner's challenge to the education system based on the state constitution *was* justiciable. *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 457 (Pa. 2017). In declining to follow *Marrero*, the Pennsylvania Supreme Court explained:

> To the extent that our prior cases have suggested, if murkily, that a court cannot devise a judicially discoverable and manageable standard for Education Clause compliance that does not entail making a policy determination inappropriate for judicial discretion, or that we may only deploy a rubber stamp in a hollow mockery of judicial review, we underscore that we are not bound to follow precedent when it cannot bear scrutiny, either on its own terms or in light of subsequent developments.

*Id.* at 456. Thus, in holding that article IX, section 1 of our state constitution does not provide judicially manageable standards, the First District relied on outdated and overruled precedent, to the exclusion of the majority of other state supreme courts.

Although the plurality does not go so far as to say that a claim under article IX, section 1 could *never* be justiciable, it nevertheless concludes that Petitioners' claim in this case is not justiciable. *See* plurality op. at 17. In reaching this conclusion, the plurality, without explanation—like the First District—declines to consider other jurisdictions that have found similar claims justiciable. *See id.* at 19. Instead, the plurality limits itself "to the language of the Florida Constitution and this Court's decisions," ignoring the reasoning of the majority of other state

- 48 -

supreme courts that have held that similar claims under their respective state constitutions are justiciable. *Id.*[16] Indeed, those courts adjudicated similar claims even though many of the education constitutional provisions in their state constitutions are less detailed than ours.[17]

16. *See, e.g.*, *Lobato v. State*, 304 P.3d 1132, 1137 (Colo. 2013) ("Plaintiffs presented a justiciable claim because 'determin[ing] whether the state's public school financing system is rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" system of public education' does not 'unduly infring[e] on the legislature's policymaking authority.'" (quoting *Lobato v. State*, 218 P.3d 358, 363 (Colo. 2008))); *Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 210 (Conn. 2010) ("[T]his court has a role in ensuring that our state's public school students receive th[e] fundamental guarantee" provided in the state constitution.); *Rose v. Council for Better Educ. Inc.*, 790 S.W.2d 186, 189 (Ky. 1989); *Cruz-Guzman v. State*, 916 N.W.2d 1, 9 (Minn. 2018) ("Although specific determinations of educational policy are matters for the Legislature, it does not follow that the judiciary cannot adjudicate whether the Legislature has satisfied its constitutional duty under the Education Clause."); *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 109 P.3d 257, 261 (Mont. 2005) ("As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right. We conclude this issue is justiciable."); *Leandro v. State*, 488 S.E.2d 249, 253 (N.C. 1997) ("It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution."); *McCleary v. State*, 269 P.3d 227, 231 (Wash. 2012) ("The judiciary has the primary responsibility for interpreting [the constitution] to give it meaning and legal effect."); *see also, e.g.*, *Hoke Cty. Bd. of Educ. v. State*, 599 S.E.2d 365 (N.C. 2004).

17. *See* Ala. Const. art. XIV, § 256; Alaska Const. art. VII, § 1; Ariz. Const. art. XI, § 1; Ark. Const. art. XIV, § 1; Cal. Const. art. IX, § 1; Colo. Const. title 22, § 1; Conn. Const. art. VIII, §§ 1-2; Del. Const. art. X, § 1; Ga. Const. art. VIII, § 1; Haw. Const. art. X, § 1; Idaho Const. art. IX, § 1; Ill. Const. art. X, § 1; Ind. Const. art. VIII, § 1; Iowa Const. art. IX, § 1; Kan. Const. art. VI, § 1; Ky. Const. § 138; La. Const. art. VIII, § 1; Me. Const. art. VIII, § 1; Md. Const. art. VIII, § 1; Mass. Const. art. V, § 2; Mich. Const. art. VIII, § 2; Minn. Const. art. VIII, § 1; Miss

In concluding that a claim similar to Petitioners' in this case was justiciable, the Supreme Court of Kentucky wrote: "The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the . . . Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do." *Rose*, 790 S.W.2d at 209. Likewise, in declining to follow its earlier precedent, the Supreme Court of Pennsylvania explained the importance of the court's judicial review function:

> Two decades after *Marbury* [*v. Madison*, 5 U.S. 137 (1803)], in another paean to the importance of judicial review, Chief Justice Marshall cautioned that "[t]he judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the [C]onstitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). The spirit of Chief Justice Marshall's cautionary refrain has informed the clear majority of state courts that have held it their judicial duty to construe interpretation—begging state education clauses like ours to ensure legislative compliance with their constitutional mandates, no matter the difficulties invited or, in many cases, confronted. We hold that our Education Clause, viewed

Const. art. VIII, § 201; Mo. Const. art. IX, § 1(a); Mont. Const. art. X, § 1; Neb. Const. art. VII, § 1; Nev. Const. art. XI, § 1; N.H. Const. art. 83; N.J. Const. art. XIII, § 1; N.M. Const. art. XII; N.Y. Const. art. XI, § 1; N.C. Const. art. I, § 15; *id.* art. IX, §§ 1-2; N.D. Const. art. VIII, §§ 1, 4; Ohio Const. art. VI, § 2; Okla. Const. art. XIII, § 1; Or. Const. art. VIII, §§ 3, 8; Pa. Const. art. III, § 14; R.I. Const. art. XII, § 1; S.C. Const. art. XI, § 3; S.D. Const. art. VIII, § 1; Tenn. Const. art. XI, § 12; Tex. Const. art. VII, § 1; Utah Const. art. X, § 1; Vt. Const. § 68; Va. Const. art. VIII, § 1; Wash. Const. art. IX, § 1; W. Va. Const. art. XII, § 1; Wis. Const. art. X, § 3; Wy. Const. art. I, § 23.

in the overarching context of our cases taking up the question of
abstention from political questions, compels the same result.

*William Penn*, 170 A.3d at 463.

In support of its conclusion in this case, the plurality attempts to distinguish this Court's precedent in *Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006), reasoning that *Holmes* addressed a narrow question involving a specific voucher program. *See* plurality op. at 27. However, nothing in *Holmes* suggests that its reasoning applies only to specific education program challenges. In fact, in *Holmes*, we clearly stated that the entire purpose of the 1998 amendment to article IX, section 1 was to "provide standards by which to measure the adequacy of the public school education provided by the state." 919 So. 2d at 403. And it was because the 1998 amendment added judicially manageable standards that this Court was able to determine whether the program at issue in *Holmes* violated article IX, section 1. *Id.* at 409. Just as in *Holmes*, a court can use the judicially manageable standards added to article IX, section 1 in 1998 to determine whether the State has violated its obligation in the context of Petitioners' claim in this case.

As an additional justification for concluding that Petitioners' claim is not justiciable, the plurality reasons that the claim "does not survive the reasoning in *Coalition*." Plurality op. at 17. But this ignores the purpose of the 1998 amendment, which was to provide judicially manageable standards so that, in the

future, courts would be equipped to evaluate alleged constitutional violations. *See*

*Holmes*, 919 So. 2d at 403.

The plurality's main contention with Petitioners' claim appears to be that

they failed to present a judicially manageable standard that would allow this Court

to consider their claim in a way that avoids judicial intrusion into the functions of

the legislative and executive branches. *See* plurality op. at 30-31. This

misunderstands Petitioners' claim as well as the judiciary's role. Petitioners do not

ask the judiciary to recreate Florida's education system. Rather, they ask the

judiciary to adjudicate whether, in light of the performance statistics they have

presented and the State's statutory standards, the State has violated its

constitutional obligation under article IX, section 1.

### Article IX, Section 1 Provides Judicially Manageable Standards

As this Court stated almost ninety years ago, "[t]he object of constitutional

construction is to ascertain and effectuate the intention and purpose of the people

in adopting it." *Amos v. Mathews*, 126 So. 308, 316 (Fla. 1930). This Court has

reiterated that principle on multiple occasions. *See, e.g.*, *Apportionment I*, 83 So.

3d at 599 ("When interpreting constitutional provisions, this Court endeavors to

ascertain the will of the people in passing the amendment."); *Pleus v. Crist*, 14 So.

3d 941, 944-45 (Fla. 2009).

Indeed, in asserting that the State has violated its constitutional obligation, Petitioners explain that the State has already determined what a high quality education is and how to measure it. They cite, for example, section 1003.41, Florida Statutes (2017), which sets forth the "core content knowledge and skills that K-12 public school students are expected to acquire." § 1003.41, Fla. Stat. (2017). In conjunction with the core content students are expected to learn, the Legislature has tasked the Commissioner of Education with "design[ing] and implent[ing] a statewide, standardized assessment program aligned to the core curricular content" established in section 1003.41. *Id.* § 1008.22(3). The State Board of Education then sets "a passing score for each statewide, standardized assessment." *Id.* § 1008.22(3)(e)2.

Further, Petitioners cite section 1000.03(5)(d), which prioritizes that "[a]cademic standards for every level of the K-20 education system are aligned, and education financial resources are aligned with student performance expectations at each level of the K-20 education system." *Id.* § 1000.03(5)(d). However, Petitioners argue that "[n]either the Legislature nor the Department of Education has ensured that education financial resources are aligned with student performance expectations as required by statute." Petrs.' Initial Br., at 9 (citing §1000.03(5)(d)). This claim is very different than simply asking that the State allocate additional funding; rather, it is about the "efficient" use of the resources

- 53 -

provided based on evidence-based practices that is critical to the success of *all* students. Thus, Petitioners do not ask the judiciary to re-create the state education system, but only to determine whether the State has complied with its constitutional obligation under its own standards in light of the fact that many students—particularly certain subgroups of students—are failing to meet the standards set by the State.

The plurality contends that Petitioners' reliance on the State's own standards is "foundationally flawed" because "adopting State standards as constitutional minima would have the perverse effect of encouraging the weakening of curriculum standards in order to achieve higher passage rates and to satisfy court-imposed requirements." Plurality op. at 31-32 (quoting Br. of Amicus Foundation for Excellence in Educ. in Support of Resps., at 13-14).[18] The reasoning is faulty.

18. Ironically the plurality relies on a statement by the Foundation for Excellence in Education, an entity dedicated to charter schools and the promotion of "privatization of schools." The website of the Foundation for Excellence in Education, a foundation based in Tallahassee and founded by former Governor Jeb Bush, explains that it strongly supports charter schools and school choice. *See About Us*, ExcelinEd, https://www.excelined.org/about/approach/ (last visited Dec. 17, 2018). Its mission is to promote "privatization" of schools. *Foundation for Excellence in Education*, Conservative Transparency, http://conservativetransparency.org/org/foundation-for-excellence-in-education/ (last visited Dec. 17, 2018). Explaining the mission of the amici is not an "ad hominem approach to challenging [the] logic," nor is it an "attempt[] to drag politics into judicial decision making." Plurality op. at 32, note 9. It is simply a fact that the plurality embraces the faulty reasoning of the amici.

If the State were to intentionally adopt low standards to achieve higher pass rates, those standards could be challenged as a violation of the State's constitutional obligation to provide a "high quality" education. Simply because Petitioners in this case do not challenge the standards set by the State does not render their claim non-justiciable.

In my view, using the State's own standards, a court could evaluate Petitioners' claim by construing the judicially manageable terms set forth in article IX, section 1, as other state supreme courts have done with their respective state constitutions. *See, e.g.*, *Rose*, 790 S.W.2d at 211; *Davis v. State*, 804 N.W.2d 618, 623-24 (S.D. 2011); *Campbell Cty. Sch. Dist. v. State*, 907 P.2d 1238, 1259 (Wyo. 1995). And, while the definitions set forth below could generally apply to any claim brought under article IX, section 1 they are construed here in the context of Petitioners' claim, which does not include a challenge to the constitutionality of the State's standards.

Uniformity

When defining constitutional terms, it is appropriate to utilize dictionary definitions. *See Apportionment I*, 83 So. 3d at 632; *see also, e.g.*, *Lobato*, 218 P.3d at 375; *Davis*, 804 N.W.2d at 624. "Uniform" is defined as "having always the same form, manner, or degree: not varying or variable" or "consistent in conduct or

opinion." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/uniform (last visited Dec. 17, 2018).

In 1997, construing the 1968 version of article IX, section 1, this Court concluded that a "uniform" system is one that "operate[s] subject to a common plan or serve[s] a common purpose." *Sch. Bd. of Escambia Cty. v. State*, 353 So. 2d 834, 838 (Fla. 1977) (emphasis added). Thereafter, we explained that "uniformity," as used in article IX, section 1, "requires that a system be provided that gives every student an equal chance to achieve basic educational goals prescribed by the legislature." *St. Johns Cty. v. Ne. Fla. Builders Ass'n*, 583 So. 2d 635, 641 (Fla. 1991); *see also Rose*, 790 S.W.2d at 211 ("Each child . . . must be provided with an equal opportunity to have an adequate education.").

Significantly, in defending against the plaintiffs' claim in *Coalition*, the State conceded in this Court that "the phrase 'uniform' has manageable standards because by definition this word means a lack of substantial variation." 680 So. 2d at 408. Further construing this term in *Holmes*, this Court concluded that the Opportunity Scholarship Program at issue violated article IX, section 1 because it "reduce[d] money available to the free schools" and "fund[ed] private schools that [we]re not '*uniform*' when compared with each other or the public system." 919 So. 2d at 398 (emphasis added).

Importantly, as Justice Kogan explained, the uniformity requirement of article IX, section 1 "is not and never was intended to require that each school district be a mirror image of every other one." *Fla. Dep't of Educ. v. Glasser*, 622 So. 2d 944, 950 (Fla. 1993) (Kogan, J., specially concurring). Rather, "variance from county to county is permissible *so long as* no district suffers a disadvantage in the basic educational opportunities available to its students, as compared to the basic educational opportunities available to students of other Florida districts." *Id.* (emphasis added). Other state supreme courts have expressed similar understandings of the term "uniform," as used in this context. *E.g.*, *Lobato*, 304 P.3d at 1138 (defining "thorough and uniform" in the state's constitution as "a free public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state"); *Leandro*, 488 S.E.2d at 348 (concluding that the right ensures that all children enjoy the right but does not require equal funding among the school districts).

These definitions provide a workable standard by which courts can determine whether the State has fulfilled its paramount duty under article IX, section 1. In this case, a court could apply these definitions and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.

<u>Efficient</u>

"Efficient" is defined as "productive of desired effects." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/efficient (last visited Dec. 17, 2018). Also looking to dictionary definitions, the Supreme Court of Wyoming defined "efficient" in this context as "productive without waste." *Campbell*, 907 P.2d at 1258-59 (quoting *Webster's Collegiate Dictionary* (10th ed. 1994)); *see also Edgewood Independent Sch. Dist. v. Kirby*, 777 S.W.2d 391, 395 (Tex. 1989) (defining "efficient" as "the use of resources so as to produce results with little waste"). The Supreme Court of Kentucky went further, defining "efficient," as used in its state constitution, as a system that is not only "operated with no waste, no duplication, no mismanagement, and with no political influence," but also, "provide[s] funding which is sufficient to provide each child in Kentucky an adequate education." *Rose*, 790 S.W.2d at 212-13.

Currently, the State uses a complex funding formula—the Florida Education Finance Program (FEFP)—that includes both state and local funds and considers many factors, including but not limited to economic disparity, cost of living, and population, to determine how much money to allocate to each school district. *See generally* § 1011.62, Fla. Stat. (2018). Petitioners do not challenge the amount of funding but, rather, assert that the State has failed to ensure that its allocations are the best use of funding. Petitioners allege that the State is not funding schools in

an efficient manner, as required by article IX, section 1.  *See* Second Am. Complaint at 19 ("Many of the State's reforms and programs . . . have wasted millions of dollars without producing the desired effect of a high quality public school system, and are thus not efficient.").

Accordingly, "efficient," as used in article IX, section 1 should be defined to mean that the State must allocate resources in a productive manner and without waste.  In this case, a court could apply this definition of "efficient," and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.

High Quality

Finally, perhaps the most critical term in article IX, section 1 must be construed.  "Quality" is defined as "degree of excellence."  *Merriam-Webster, https://www.merriam-webster.com/dictionary/quality* (last visited Dec. 17, 2018). "High," of course, modifies the word "quality" to demand something more than average quality.  In defining this term, we are cognizant of the fact that the term "high quality" is used twice in article IX, section 1.  "Adequate provision shall be made by law for a uniform, efficient, safe, secure, and *high quality* system of free public schools that allows students to obtain a *high quality* education . . . ."  Art. IX, § 1, Fla. Const. (emphasis added).  The plain language of the provision requires

the State to not only provide a high quality *system*, but also allow students to obtain a high equality *education*.

As the Supreme Court of North Carolina has explained, courts may look to "[e]ducational goals and standards" set forth by the Legislature for determining whether the State has met its constitutional obligation. *Leandro*, 488 S.E.2d at 259. Indeed, the Florida Legislature has already defined "high quality" by providing substantive content standards for students. As an example, the State prioritizes students' preparation for postsecondary education without remediation. § 1000.03(5)(a), Fla. Stat. (2018). The State also prioritizes students' preparation "to become civically engaged and knowledgeable adults who make positive contributions to their communities." *Id.* § 1000.03(5)(c).

Accordingly, for purposes of the controversy before us, "high quality" means an education system that allows all students an equal opportunity to learn the core content knowledge set by the State and become knowledgeable and engaged adults. In this case, a court could apply this definition of "high quality" and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.

Thus, contrary to the plurality's contentions, using basic rules of statutory construction—including looking to the dictionary to determine plain meaning—the terms in article IX, section 1 are fully capable of being construed by the courts.

Reading these definitions together, a court would be perfectly capable of determining whether, under the facts presented, the State has fulfilled its "paramount" constitutional duty to make "adequate provision" for a "uniform, efficient . . . and high quality system of free public schools" for Florida's children. Art. IX, § 1, Fla. Const. In this case, because the trial court concluded that article IX, section 1 did not provide judicially manageable standards and used the wrong evidentiary standard for evaluating the petitioners' claim, I would remand the case back to the trial court to reconsider the evidence and Petitioners' claim in light of these definitions.

### No Independent Basis Exists for Rejecting Petitioners' Claim

As an "independent basis" for rejecting Petitioners' claim, the plurality concludes that "on the record presented here the Petitioners still could not prevail." Plurality op. at 34. In support of this conclusion, the plurality notes the trial court's finding that Petitioners "failed to establish any causal relationship between any alleged low student performance and a lack of resources," and that "the weight of the evidence . . . establishes a *lack* of any causal relationship between additional financial resources and improved student outcomes." *Id.* at 35. However, even though the trial court used the phrase "weight of the evidence," it made clear that, to prevail, Petitioners would have to show that the State's actions "are irrational or unconstitutional beyond a reasonable doubt." Final J. at 24.

Although the trial court ultimately concluded that Petitioners failed to establish causation, significant evidence was presented, indicating that when additional resources were allocated to low-performing schools, those schools improved. In fact, the State's own expert agreed with Petitioners that more resources are needed to educate African-American students, Hispanic students, and students in poverty. That very expert has written articles on the fact that state education systems "should . . . effectively use more resources for poor kids." The State's expert further agreed with Petitioners' contention that money matters when it is spent efficiently, testifying: "Effective use by management, the funds will be effective."[19] This is logical given that the students who perform the lowest on statewide assessments generally attend schools in poorer school districts.

Indeed, only 5% of 8th graders in Bradford County passed the statewide mathematics assessment, with a pass rate of 0% among African-American students. Petrs.' Initial Br. at 5. That's correct: Zero. None. And only 26% of the 10th graders in Gadsden County passed the statewide reading assessment. *Id.* On the other hand, in St. Johns County, one of the State's wealthier school districts,

19. The State's expert has consistently testified in over twenty of these education cases nationwide on behalf of state governments since the 1970s that there is generally no correlation between spending more money and higher student performance.

76% of 3rd graders and 75% of 10th graders passed the statewide reading assessment. *Id.*

Additionally, the trial court reached its conclusion on causation only after determining that the terms in article IX, section 1, were not capable of judicial construction. In other words, the trial court's conclusion on causation is based on a flawed premise—that article IX, section 1 does not provide judicially manageable standards—and an improper evidentiary standard, beyond a reasonable doubt. Thus, because the trial court's findings on the merits were made in a constitutional vacuum, they are not entitled to deference.

Based on the evidence presented, Petitioners have made a strong showing that the State has failed to provide a "high quality" and "efficient" education to all of Florida's students. Thus, we cannot presume that if this case were remanded to the trial court to reconsider the evidence and Petitioners' claim using these definitions and the proper evidentiary standard, the trial court would reach the same conclusion. Accordingly, I disagree that the trial court's finding that Petitioners' "failure to establish such a causal relationship provides an independent basis for rejection of their claims." Plurality op. at 35.

**We Should Remand this Case to the Trial Court to Reconsider the Evidence and Petitioners' Claim in Light of These Definitions**

In concluding that the State has not violated its constitutional obligation, the trial court observed that in 2014, 58% of students across grades 3 through 10

scored at or above grade level in reading, "a two percentage point improvement over 2011." Findings of Fact at 81. The trial court further found that, in 2001, only 47% of students were reading at or above grade level. *Id.* at 80. The trial court also devoted eight pages to comparing Florida's results to other states' results. *See id.* at 71-79. However, in my view, "adequate provision," as used in article IX, section 1, is an objective standard that does not consider improvements that have been made or what other states are doing. Further, it is hard to understand how objectively Florida compares to other states that might not even have the "high quality" education mandate in their constitutions when it ranks 29th overall in education and its per-pupil spending falls well below the national average. *See supra* note 15.

Instead of focusing on improvements over the years or state-by-state comparisons, the trial court should have considered the statewide deficits on achievement in reading and math.[20] While it cannot be disputed that Florida has made improvements, the evidence, as found by the trial court, still shows that only a bare majority of Florida's children are reading at grade level; 42% are below grade level. Again, I must ask: In what judicial universe does the set of facts

20. *See, e.g.*, *Leandro*, 488 S.E.2d at 259 ("Another factor which may properly be considered in this determination is the level of performance of the children of the state and its various districts on standard achievement tests.").

presented demonstrate that the State is fulfilling its constitutional obligation to provide a "uniform," "efficient," and "high quality" education?

Using the definitions provided and the State's own standards as a measuring stick, the trial court could very well have concluded on remand that the State has violated its constitutional obligation under article IX, section 1 thereby entitling Petitioners to a declaratory judgment. The trial court could then have heard arguments on the appropriate remedy.[21]

Certainly, I recognize that the task of making adequate provision for a high quality education is primarily for the Legislature. We are not legislators. We are justices charged with enforcing the rights set forth in Florida's Constitution. That is why with article IX, section 1 the citizens of this State intended for compliance—or noncompliance—with that provision to be adjudicated by the judiciary when properly brought to the court. Indeed, the task of construing the constitution and determining whether the State is fulfilling its express obligations required by the constitution—and the citizens of this State who approved the

---

21. *See, e.g.*, *Idaho Schs. for Equal Educ. Opportunity v. State*, 976 P.2d 913, 922 (Idaho 1998) ("We do not express any opinion at this time about the appropriate relief that should be granted if the trial court decides that Plaintiffs are entitled to relief."); *Leandro*, 488 S.E.2d at 261 (stating that if, on remand, the trial court finds a violation "it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment on the other branches of government").

relevant constitutional language—is solely the judiciary's task. "This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public." *Rose*, 790 S.W.2d at 209.

## CONCLUSION

The significance of education both to the success of our children and to a functioning democracy cannot be overstated. The drafters of Florida's Constitution recognized this fact "and, accordingly, included the education provision to guarantee that a system of free public education be established for the citizens of Florida." *Coalition*, 680 So. 2d at 409 (Overton, J., concurring). That guarantee means nothing, however, without a judicial branch willing to perform its constitutional duty.

With its decision today, "this Court has failed to carry out its duty to ensure that the legislature" and the executive branch have complied with their constitutional obligation under article IX, section 1. *Id.* at 410 (Anstead, J., dissenting). The plurality has abdicated its responsibility to interpret the constitution and eviscerated article XI, section 1 contrary to the clear intent of the voters. And, at the center of this dispute are the students who are at the greatest risk of failing—African-American students, Hispanic students, economically

- 66 -

disadvantaged students and school districts, and students attending persistently low-performing schools.

Because I would conclude that Petitioners' claim is justiciable and would allow them the opportunity to establish that the State is violating its constitutional obligation, I dissent.

LEWIS and QUINCE, JJ., concur.

LEWIS, J., dissenting.

My friends and colleagues in the majority make a very grave and harmful mistake today. Although I understand their good-faith and well-intentioned approach, only time will truly reveal the depth of the injury inflicted upon Florida's children. The words describing the right to a high quality education and the constitutional concept of protecting that right ring hollow without a remedy to protect the right.

The Florida Constitution guarantees each child the right to a high quality education. Art. IX, § 1(a), Fla. Const.; *Scavella v. School Bd. of Dade Cty.*, 363 So. 2d 1095, 1098 (Fla. 1978) ("[A]ll Florida residents have the right to attend this public school system for free."). When that right is infringed upon by the Legislature, the Department of Education, a county school board, or some other entity, our children must have the opportunity to seek a remedy in the courts. Art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any

injury, and justice shall be administered without sale, denial or delay."). This proposition seems too basic to consume much ink here:

> The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). Here the majority now places Florida among the very few other states which are in disagreement with regard to whether these educational type claims are justiciable. In my view, article IX, section 1(a) clearly presents many justiciable questions that Florida courts can and should decide. *See* The Federalist No. 80, at 507-08 (Alexander Hamilton) (R. Scigliano ed. 2000) ("The first point depends upon this obvious consideration, that there ought always to be a constitutional method of giving efficacy to constitutional provisions."). This Court has already decided that article IX, section 1(a), Florida Constitution, is justiciable, and most other states which have addressed the issue have held the same. I write separately, however, to emphasize the propriety of Florida courts addressing these claims.

Our Florida Constitution is a principled document, constructed with principled words, which produces principled concepts that our citizens have asserted as the organic law of our society. It is a dereliction of our duty as the ultimate arbiter of Florida constitutional law to conclude that the interpretation of that text is beyond our grasp and solely within the realm of legislative whims. We

have a responsibility to interpret and apply the rights and principles set forth in the Constitution, including article IX, section 1(a). *Dade Cty. Classroom Teachers Ass'n v. Legislature of Fla.*, 269 So. 2d 684, 686 (Fla. 1972) ("When the people have spoken through their organic law concerning their basic rights, it is primarily the duty of the legislative body to provide the ways and means of enforcing such rights; however, in the absence of appropriate legislative action, it is the responsibility of the courts to do so."); *see Marbury*, 5 U.S. (1 Cranch) at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."). If we, as common law judges, do not discharge our duty to interpret the Constitution—even in complex and at times largely passionate cases—then constitutional protections would never have life. Therefore, the onus falls on this Court to ensure that the principles enshrined by Floridians in our Constitution have meaning and a field of operation, including the right to a high quality education. *See Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.' " (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))).

A "narrow exception" to the rule of judicial review is made for nonjusticiable political questions. *Id.* To be sure, the doctrine of nonjusticiability is proper in some cases under certain circumstances: for instance, when "there is 'a textually demonstrable constitutional commitment of the issue to a coordinate

political department; or a lack of judicially discoverable and manageable standards

for resolving it.' " *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting

*Baker v. Carr*, 369 U.S. 186, 217 (1962)).[22] Yet, in my view, neither of those

elements are present here.

Preliminarily, "courts must, in the first instance, interpret the text in question

and determine whether and to what extent the issue is textually committed."

*Nixon*, 506 U.S. at 228. Both the First District Court of Appeal below and the

Respondents argue that the inclusion of the phrase "by law" in article IX, section

1(a) somehow places the entire field of education as within the exclusive,

unreviewable province of the legislative and executive branches. That logic is

flawed. "By law" is a common phrase in our Constitution—used on 155

occasions—simply to signify that some legislation in the area is either permissible

or necessary. *See Ison v. Zimmerman*, 372 So. 2d 431, 434 (Fla. 1979); *Fla. Carry,*

*Inc. v. City of Tallahassee*, 212 So. 3d 452, 460 (Fla. 1st DCA 2017). Perhaps

nowhere is the fallacy of this reasoning more apparent than as it pertains to

Florida's constitutional right to bear arms—article I, section 8(a), Florida

Constitution. That provision guarantees the "right of the people to keep and bear

_____

22. Although there are six *Baker* factors, the Supreme Court places most emphasis on the first two, which are listed here. *See Zivotofsky*, 566 U.S. at 194-95; *see also Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion).

arms," "except that the manner of bearing arms may be regulated *by law*." *Id.* (emphasis added). Surely, neither the First District nor the Respondents could argue with a straight face that Florida's right to bear arms is a nonjusticiable political question, despite it being a hot-button political issue and including the phrase "by law." Gun owners regularly challenge gun laws and courts concomitantly adjudicate those challenges as justiciable. *See Norman v. State*, 215 So. 3d 18 (Fla. 2017). Therefore, nothing in the language of article IX, section 1(a) so much as hints at the notion that the definition of a right to education is exclusively a legislative and executive prerogative.

Next, courts look to whether there are "judicially discoverable and manageable standards." *Vieth*, 541 U.S. at 278 (quoting *Baker*, 369 U.S. at 217). Article IX, section 1(a) expressly includes the standard for determining the "adequate provision" for education: the public system must be "uniform, efficient, safe, secure, and high quality." Art. IX, § 1(a). One of these requirements, uniformity, we have already construed and adjudicated. *Bush v. Holmes*, 919 So. 2d 392, 412-13 (Fla. 2006). Two of the other requirements, safe and secure, are certainly subject to judicial review—as the trial court concluded in the final order. Final Order at 19 ("The terms in Article IX relating to "safe" and "secure" are subject to judicially manageable standards. . . . Florida's trial courts deal with issues related to safety and security all day long."). That leaves two of the five

- 71 -

requirements, which are the two at issue here, efficient and high quality. Both of those terms are capable of interpretation.[23] Therefore, there are clearly judicial standards to guide courts—those that the people of Florida specifically chose to include in article IX, section 1(a).

The process of interpreting and defining those terms may be somewhat challenging, but nonjusticiability is simply not the appropriate solution. Judges occasionally throw up justiciability barricades only to avoid the difficult or complex cases, taking the easy way out by using excuses to defer the decision of a case to a legislative body. But if our standard is to avoid difficult questions simply because they may implicate some attenuated political concern, then the Legislature has carte blanche to do as it pleases without any constitutional oversight or protection. The Legislature is composed of politicians; so, by definition, everything that the Legislature does is political in the abstract. Moreover, almost every statute that the Legislature passes involves appropriations to some extent. Therefore, it should be with severe caution that judges decide an entire

---

23. Other courts have defined an efficient school system. *E.g.*, *DeRolph v. State*, 728 N.E.2d 993, 997-98 (Ohio 2000); *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 SW.3d 746, 752-53 (Tex. 2005); *Pauley v. Kelly*, 255 S.E.2d 859, 705-07 (W. Va. 1979). Although high quality may be more difficult to define, it is not beyond a precise definition. *Contra Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1191-93 (Ill. 1996) (holding that "high quality" cannot be judicially ascertained based on the Illinois Constitution).

constitutional provision is nonjusticiable on the basis that it touches upon politics or the spending of money. I understand and recognize that separation of powers is certainly a foundational principle of our system of government, art. II, § 3, Fla. Const.; however, that proposition is as much about delineating a department's proper exercise of power as it is about establishing a system of checks and balances to prevent the accumulation of power in any one branch. The Federalist No. 51, at 331 (James Madison) (R. Scigliano ed. 2000) ("In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."). The history of our constitutional experiment is riddled with examples of courts struggling with difficult and complex questions—and providing eloquent answers—to the extent and meaning of broadly phrased constitutional protections, even when answering arguably political questions. There are far too many illustrations to list here, so a few examples must suffice.

First, courts have wrangled with the meaning of due process since the inception of this country. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976); *Dent v. West Virginia*, 129 U.S. 114, 122-24 (1889). Well over 100 years ago, the United States Supreme Court concluded that "it may be difficult, if not impossible, to give to the terms 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights." *Dent*, 129

U.S. at 123. Despite the impossibility of any bright-line judicial standard, here we are today still deciding the meaning and extent of guaranteed due process rights. *E.g.*, *Jennings v. State*, 43 Fla. L. Weekly S427 (Fla. Oct. 4, 2018) (concluding that a defendant's due process rights were not violated). Correspondingly, courts regularly wrestle with the rubik's cube of due process to determine the extent of constitutional protections despite those protections virtually always implicating appropriations. For instance, in *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Supreme Court held that due process requires states to provide public-aid recipients with a hearing before terminating their benefits. *Id.* at 261-66. Although hearings necessitate funding and welfare benefits are a politically charged issue, the Court properly decided the case on due process grounds without mention of justiciability. Thus, for as long as courts are trying to define the precisely undefinable, such as due process, they should be expected to apply express constitutional principles, like those announced in article IX, section 1(a).

Second, judges determine the meaning of equal protection, which regularly implicates political, policy, and appropriations issues without absolute or exactingly clear judicial standards. It is fitting to use *Brown v. Board of Education*, 347 U.S. 483 (1954), as an example. The Court there held that segregated schools are "inherently unequal" and, therefore, violate equal protection. *Id.* at 495. Of course, *Brown* had wide-ranging effects on

appropriations by Congress and state legislatures across the country. Moreover, the case settled an abhorrent political debate. But, in ordering desegregation, the Court could not set out exactingly detailed judicial standards on how the process would occur—that was left for state school officials, legislatures, and courts to sort out. *Brown v. Bd. of Educ.* (*Brown II*), 349 U.S. 294, 299-300 (1955).[24] The Court understood that there was no one-size-fits-all judicial standard on the most effective manner of desegregation, so it ordered state courts to supervise that process—which most certainly entailed many policy decisions—to determine compliance. *Brown II*, 349 U.S. at 299-300. A similar circumstance exists here. Petitioners ask this Court to review certain actions, performances, and conduct of the school system to decide whether it is within constitutional parameters. They do not ask us to make any of the myriad policy decisions that go into the operation of a school system; rather, they seek review of the system itself to determine if it meets constitutional muster. Thus, any suggestion that the express Florida constitutional right to an education is nonjusticiable cannot in my view withstand scrutiny.

---

24. In the aftermath of *Brown*, this Court displayed one of its most shameful moments through the treatment of Virgil Hawkins and similarly situated students. *See State ex rel. Hawkins v. Bd. of Control*, 83 So. 2d 20 (Fla. 1955). Although any justiciability disagreement here cannot approach the foul factors at play there, it is worth noting that not even the *Hawkins* Court suggested that desegregation of schools was nonjusticiable. *See generally id.*

Third, courts draw lines every day on unreasonable searches and seizures regardless of the fact that constantly changing circumstances make a final resolution of Fourth Amendment protections with mathematical precision impossible. For example, whether interpreting privacy rights in invoices for cases of glass, *Boyd v. United States*, 116 U.S. 616 (1886), or cell phone location data, *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court has interpreted the same words to elucidate their meaning throughout the ages in vastly different areas. Just because those standards will most assuredly change over time does not portend that legislative actions are free from judicial review. With regard to justiciability, it is also of no importance that court interpretations of the Fourth Amendment will always remain behind the cutting edge of technology. Judges will continue to interpret that language to determine the protections guaranteed for as long as our system exists. The same should be true of the express right to an education in Florida.

Finally, courts have interpreted the implicit constitutional right to marriage. In *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the Supreme Court held that same-sex couples have a fundamental right to marriage, which states cannot abridge. *Id.* at 2604-05. Despite the fact that there is no express constitutional right to marriage and *Obergefell* concerned a divisive political issue, the Court decided the case. Tellingly for our purposes, however, not even the various

- 76 -

dissenting opinions there disputed the justiciability of that question. *Id.* at 2611-43. If implied constitutional rights are justiciable, then surely expressly stated constitutional rights with parameters are—thus article IX, section 1(a) presents a justiciable question.

The point of these examples is to simply illustrate that courts regularly define and interpret broad, principled constitutional language on politically sensitive issues, regardless of appropriations and policy concerns, even in the absence of bright-line mathematically precise standards. The instant dispute is not about whether the education system is adequate; rather, we face the threshold question of whether that issue can even be considered and ruled upon by Florida courts. Our school system may or may not be adequate, but we will never know if the Court categorically relegates the question to an unreviewable status. In my view, justiciability is an excuse here to avoid a tough case in these education adequacy challenges, rather than sound legal reasoning based on a valid separation of powers analysis. And, when the risk is that a nonjusticiability label could render nugatory our children's constitutional right to an education, dodging our duty will not suffice. A few months ago, our sister court in Minnesota succinctly summarized this issue:

> Although specific determinations of educational policy are matters for the Legislature, it does not follow that the judiciary cannot adjudicate whether the Legislature has satisfied its constitutional duty under the Education Clause. Deciding that [these] claims are not

justiciable would effectively hold that the judiciary cannot rule on the Legislature's noncompliance with a constitutional mandate, which would leave Education Clause claims without a remedy. Such a result is incompatible with the principle that where there is a right, there is a remedy.

*Cruz-Guzman v. State*, 916 N.W.2d 1, 9 (Minn. 2018).

The importance of education to the people of this State and to the State itself cannot be overstated. Education and educational opportunities are not only foundational for the State of Florida but are part of the essential building blocks for a free and open society. Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 *The Writings of James Madison* 103 (Gaillard Hunt ed. 1910) ("Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."). The life of a strong and vibrant republic has and always will have a direct connection to the quality of the educational status of our people.

While the substantive concept of education generally has grown to become both vast and complex, it does not always lend itself to fastidious description with absolute and complete mathematical, formal precision. The politicians do not own our government nor do they have the power to ignore specific rights placed in our Constitution by our citizens. Art. I, § 1, Fla. Const. ("All political power is inherent in the people."). The protections our citizens have demanded are merely

hollow phrases of nothingness if there is no remedy or actual access to the protections listed.

For these reasons, I would conclude that the rights enshrined in article XI, section 1(a) are justiciable.

PARIENTE and QUINCE, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Constitutional Construction

First District - Case No. 1D16-2862

(Leon County)

Jodi Siegel and Kirsten Anderson of Southern Legal Counsel, Inc., Gainesville, Florida; Timothy McLendon, Gainesville, Florida; Deborah Cupples, Gainesville, Florida; Eric J. Lindstrom of Egan, Lev & Siwica, P.A., Gainesville, Florida; and Neil Chonin, Gainesville, Florida,

for Petitioners

Edward M. Wenger, Chief Deputy Solicitor General, Office of the Attorney General, Tallahassee, Florida; Rocco E. Testani of Eversheds Sutherland (US) LLP, Atlanta, Georgia; Matthew H. Mears, General Counsel, Department of Education, Tallahassee, Florida; Dawn Roberts, General Counsel, Florida Senate, Tallahassee, Florida; and Adam S. Tanenbaum, General Counsel, Florida House of Representatives, Tallahassee, Florida,

for Respondents

Ari Bargil of Institute for Justice, Miami, Florida; Timothy D. Keller of Institute for Justice, Tempe, Arizona; and Richard Komer of Institute for Justice, Arlington, Virginia,

for Respondents Celeste Johnson, Kenia Palacios, Deaundrice Kitchen, Margot Logan, Karen Tolbert, and Marian Klinger

Courtney Brewer of The Mills Firm, P.A., Tallahassee, Florida,

for Amicus Curiae Education Law Center

Dena H. Sokolow and Renee Meenach Decker of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Fort Lauderdale, Florida,

for Amicus Curiae National Law Center of Homelessness and Poverty

Robert M. Brochin and Clay M. Carlton of Morgan, Lewis & Bockius LLP, Miami, Florida; Jon Lester Mills and Stephen N. Zack of Boies Schiller & Flexner, LLP, Miami, Florida; and Stuart H. Singer and Johnathan Lott of Boies Schiller & Flexner, LLP, Fort Lauderdale, Florida,

for Amicus Curiae Certain Commissioners of the 1998 Constitution Revision Commission

Lazaro J. Mur of The Mur Law Firm, P.A., West Palm Beach, Florida; Matthew J. Conigliaro of Carlton Fields Jorden Burt, P.A., Tampa, Florida; Russell C. Menyhart of Taft Stettinius & Hollister LLP, Indianapolis, Indiana; and Leslie Davis Hiner of EdChoice, Indianapolis, Indiana,

for Amici Curiae Florida State Hispanic Chamber of Commerce and EdChoice

Raoul G. Cantero and Josefina Aguila of White and Case LLP, Miami, Florida,

for Amicus Curiae The Urban League of Greater Miami

Daniel P. Kearney, Jr., Daniel Hartman, and Kevin Gallagher of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, District of Columbia; and Andy Bardos of Gray Robinson, P.A., Tallahassee, Florida,

for Amicus Curiae The Foundation for Excellence in Education, Inc.

Joseph S. Van de Bogart of Van de Bogart Law, P.A., Fort Lauderdale, Florida,

for Amici Curiae United Cerebral Palsy Association of Miami, Inc., d/b/a United Community Options of Miami, and United Cerebral Palsy of Broward, Palm Beach and Mid-Coast Counties, Inc. d/b/a United

Community Options of Broward, Palm Beach and Mid-Coast Counties, jointly d/b/a United Community Options of South Florida

Kevin W. Shaughnessy of Baker & Hostetler LLP, Orlando, Florida,

for Amicus Curiae Several Members of the 1998 Constitution Revision Commission